Approved: _/s/_ _____
         JAIMIE L. NAWADAY
         Assistant United States Attorney

Before:   HONORABLE KEVIN N. FOX
          United States Magistrate Judge
          Southern District of New York

15 MAG 1717

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :   **SEALED**
                                    **COMPLAINT**
         - v. -                 :
                                    Violation of 18 U.S.C.
                                :   §1349

MARIO ALVARENGA,                    COUNTY OF OFFENSE:
RAJESH MADDIWAR, and            :   NEW YORK
AMIR MEIRI,
                                :
              Defendants.
                                :

- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    ROBERT GOLDBACH, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

COUNT ONE
(Conspiracy to Commit Wire Fraud)

    1.   From at least in or about January 2013 up to and including at least in or about May 2015 in the Southern District of New York and elsewhere, MARIO ALVARENGA, RAJESH MADDIWAR, and AMIR MEIRI, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

    2.   It was a part and object of the conspiracy that MARIO ALVARENGA, RAJESH MADDIWAR, and AMIR MEIRI, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by

means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

3. I have been a Special Agent with the FBI for approximately two and a half years. I have also been personally involved in the investigation of this matter, and have been involved in the investigation and prosecution of numerous fraudulent schemes. This affidavit is based upon my own observations, conversations with other law enforcement agents and others, and my examination of reports and records prepared by others. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**RELEVANT ENTITIES**

4. At all times relevant to this Complaint, Homeowner Assistance Services of New York ("HASNY") was purportedly an organization that provided assistance to homeowners who were seeking to avoid foreclosure. HASNY maintains an office at 189-10 Hillside Avenue, Hollis, New York (the "Hillside Address"), and lists its address in corporate filings as 69 Horatio Street, Apartment 2F, New York, New York (the "Horatio Address"). Until at least April 2015, HASNY maintained a website at www.hasony.com as well as a Facebook page. Neither the HASNY website nor its Facebook page contained any reference to Launch Development, LLC.

5. At all times relevant to this Complaint, Launch Development, LLC ("Launch Development") was purportedly a for-profit real estate company. Launch Development also maintains an office at the Hillside Address, and lists its address in corporate filings as the Horatio Address. Launch Development is owned by AMIR MEIRI, the defendant, and a co-conspirator not named herein ("CC-1").

2

## OVERVIEW OF THE FRAUDULENT SCHEME

6. Beginning in or about at least January 2013, through in or about at least May 2015, AMIR MEIRI, the defendant, and others targeted distressed homeowners living in the New York City area, including the Bronx, Brooklyn, and Queens. At the direction of MEIRI and others, Launch Development employees sent mailings under the HASNY letterhead to the owners of distressed properties, inviting them to seek assistance from HASNY to avoid foreclosure and save their homes. Additionally, teams of telemarketers employed by Launch Development called the homeowners and invited them to meet with HASNY representatives to learn more about avoiding foreclosure.

7. Many of the homeowners who sought assistance from HASNY met with MARIO ALVARENGA, the defendant, who typically advised each homeowner that HASNY could assist him or her with a loan modification. In still other cases, ALVARENGA advised the homeowner that a loan modification could not be completed, but that the homeowner could engage in a type of short sale in which the homeowner would sell the property to a third party, Launch Development, and then within approximately 90 days arrange for a relative of the homeowner to repurchase the property from Launch Development. ALVARENGA typically explained that the homeowner could remain in his or her home throughout the entire process. ALVARENGA then typically scheduled a closing at which the homeowner would meet with RAJESH MADDIWAR, the defendant, who was described as the homeowner's attorney for the transaction. The homeowners, who had been led to believe that they were about to receive a loan modification or transfer their property to a trusted relative, were then encouraged to sign documents presented by MADDIWAR, which in some cases were blank. Unbeknownst to the homeowners, by signing some of those documents, they were agreeing to sell their homes to Launch Development and would be forced to vacate their homes soon thereafter.

8. After purchasing a property from a homeowner, AMIR MEIRI, the defendant, and CC-1 typically appeared at the homeowner's residence and demanded that the homeowner vacate the premises and/or commenced eviction proceedings against the homeowner.

## DEFENDANTS' SCHEME TO DEFRAUD DISTRESSED HOMEOWNERS

9. From my review of the HASNY website and associated Facebook page, as well as the host and domain

information for the HASNY website, I know the following:

  a. The HASNY website is hosted outside of the State of New York.

  b. HASNY advertises on its website, in sum and substance, that it provides assistance to homeowners who are seeking to avoid foreclosure.

  c. HASNY specifically lists "foreclosure avoidance" as its primary service and represents that HASNY is "authorized to negotiate with the bank" and "expedite[s] the paperwork with a speedy process to accommodate you and save your home." Elsewhere, the website states that "[h]omeowners unable to make their mortgage payments can look for alternatives to avoid foreclosure. . . . Let us work on your situation and preserve your dream of homeownership."

  d. HASNY's Facebook page advertises that it is "New York City's #1 resource for homeowners," represents that it offers "free service to Brooklyn residents" and contains graphics stating, "stop foreclosures" and "avoid foreclosure." HASNY's Facebook page identifies HASNY's address as the Hillside Address.

  10. From my interviews with an individual ("Victim-1"), and my review of documents provided by Victim-1, I have learned, among other things, the following:

  a. By in or about January 2014, Victim-1, an elderly immigrant, had fallen behind on the mortgage payments associated with his residence, located in Brooklyn, New York.

  b. In or about February 2014, Victim-1 received a telephone call from someone who claimed to be associated with HASNY and stated that HASNY would be able to help Victim-1 refinance an existing mortgage loan at no cost to Victim-1. Victim-1's outstanding loan amount at that time was approximately $150,000. Victim-1 informed ALVAREGNA that he was interested in lowering his mortgage payments.

  c. On or about February 14, 2014, MARIO ALVARENGA, the defendant, telephoned Victim-1 and represented that he had negotiated a loan modification with Victim-1's bank and that he was sending a car to pick up Victim-1 because Victim-1 had to sign the paperwork for the refinancing of the loan immediately.

4

d. Later that day, ALVARENGA sent a car to Victim-1's residence in Brooklyn, New York, which then drove Victim-1 to an office building located at the Hillside Address.

e. When Victim-1 arrived at the Hillside Address, ALVARENGA met Victim-1, gave Victim-1 a HASNY business card identifying ALVARENGA as the "Vice President of Operations" of HASNY and directed Victim-1 into a conference room. There, ALVARENGA presented Victim-1 with a series of documents that Victim-1 had difficulty reading due to an eye condition.

f. In the conference room at the Hillside Address, ALVARENGA also introduced Victim-1 to RAJ MADDIWAR, the defendant, who represented to Victim-1 that he would be Victim-1's attorney for the transaction. Victim-1 had not previously met with MADDIWAR, and MADDIWAR did not explain the nature of the transaction or the documents to Victim-1.

g. Victim-1 signed the documents provided to him by ALVARENGA and MADDIWAR, which stated that Victim-1's home would be sold to Launch Development for approximately $175,000. At the time he signed the documents, Victim-1 believed, based in part on statements made by ALVARENGA, that the documents would not lead to a transfer of ownership but would rather result in lower monthly mortgage payments. Based upon my review of real estate databases, at the time of the transaction, the average home price in Victim-1's neighborhood was approximately $450,000.

h. ALVARENGA signed the transaction documents, identifying himself as the "buyer's broker" and as being associated with HASNY. MADDIWAR also signed the transaction documents, identifying himself as the "Escrow/Closing Agent."

i. ALVARENGA provided Victim-1 with a check for $3,000, which was signed by AMIR MEIRI, the defendant, and drawn from the account of Launch Development. Victim-1 was then driven back to his residence.

j. In or about November 2014, Launch Development LLC commenced eviction proceedings against Victim-1.

5

11. Based upon my interviews of a second individual ("Victim-2") and my review of documents provided by Victim-2, I learned, among other things, the following:

    a. In or about December 2013, Victim-2, an elderly immigrant, received a call from a woman ("CC-2") who represented that she was from HASNY and could help Victim-2, who was then facing foreclosure, keep Victim-2's home, which was located in Brooklyn, New York. After Victim-2 expressed interest in avoiding the foreclosure of Victim-2's home, another individual who claimed to be associated with HASNY ("CC-3") visited Victim-2 at Victim-2's home in Brooklyn, New York, obtained information from Victim-2 regarding Victim-2's household income and assets, and asked Victim-2 to sign some paperwork. CC-2 also represented that HASNY would help Victim-2 save Victim-2's home by re-establishing Victim-2's mortgage.

    b. On or about May 15, 2014, Victim-2 received a call from MARIO ALVARENGA, the defendant, who instructed Victim-2 to come to HASNY for a meeting so that they could discuss how to save Victim-2's home. The same day, ALVARENGA sent a car to Victim-2's home, and Victim-2 and a family member were driven to the Hillside Address.

    c. When Victim-2 arrived at the Hillside Address with Victim-2's family member, ALVARENGA provided them with a HASNY business card indicating that ALVARENGA was the "Vice President of Operations" of HASNY. ALVARENGA stated in sum and substance that they were taking the first step in saving Victim-2's home and "re-establishing" Victim-2's mortgage. ALVARENGA then escorted Victim-2 into a conference room, leaving Victim-2's family member in a waiting area. Victim-2 was then introduced to other individuals, including RAJ MADDIWAR, the defendant, who was described by ALVARENGA as the individual who would be Victim-2's lawyer and would be representing Victim-2's interests at the meeting. Victim-2 had not met MADDIWAR previously and had no private conversation with him.

    d. In the course of the meeting, MADDIWAR presented Victim-2 with numerous documents for his signature, which Victim-2 proceeded to sign. MADDIWAR did not explain the documents to Victim-2 or explain why Victim-2 needed a lawyer. At the time he signed the documents, Victim-2 believed, based in part on representations made by ALVARENGA, that he was adjusting his mortgage so that he could obtain more affordable financing and remain in his home. In reality, the documents reflected a

6

sale of Victim-2's property to Launch Development for the price of $350,000.

   e. After the meeting, ALVARENGA again stated in sum and substance that the meeting had been the first step in saving Victim-2's home. ALVARENGA then added that the next step in re-establishing Victim-2's mortgage would be for Victim-2 to show proof of income far greater than the amount of income that Victim-2 had previously informed ALVARENGA that Victim-2 earned.

   f. In or around June 2014, Victim-2 began to receive phone calls from individuals purporting to be employees of Launch Development, who stated in substance and in part, that Victim-2 needed to vacate his home.

   g. Around the same time, notices were posted on Victim-2's property, which was a multi-family property that included rental units. The notices stated, in part, "effective immediately all rental payments are to be made payable to Launch Development, LLC, the new and lawful owner of this property" and listed ALVARENGA as the point of contact. The address for Launch Development on the notice was the Hillside Address. A business card for ALVARENGA left at Victim-2's property also identified ALVARENGA as "Business Development Manager" for Launch Development.

   h. In or about early July 2014, Victim-2 received a notice from Launch Development that Victim-2 would face eviction proceedings unless Victim-2 vacated the residence by on or about August 5, 2014.

   i. In or about late July 2014, three men appeared at Victim-2's home and began drilling through the locks on the front door, stopping only after Victim-2 contacted the police. Throughout July 2014, Victim-2 repeatedly received telephone calls from AMIR MEIRI, the defendant, and CC-1, demanding that Victim-2 vacate the premises so they could renovate the property and sell it.

   j. In or about late August 2014, Launch Development began eviction proceedings against Victim-2.

  12. Based upon my conversations with another law enforcement agent who interviewed a third individual ("Victim-3") and my review of documents provided by Victim-3, I learned, among other things, the following:

7

a. In or about December 2013, Victim-3, who suffered from health issues, had fallen behind on her mortgage payments and was facing foreclosure.

b. In or about January 2014, after attempting and failing to secure a loan modification, Victim-3 entered into a contract to sell Victim-3's home in Brooklyn, New York, for approximately $850,000.

c. On or about February 4, 2014, Victim-3 received a telephone call from MARIO ALVARENGA, the defendant, who represented that he, acting through HASNY, could help Victim-3 save Victim-3's home through a loan modification and that he wanted to meet in order to help Victim-3. Victim-3 agreed to meet with ALVARENGA but stated that Victim-3's car was unavailable and that Victim-3 had already entered into a contract to sell Victim-3's home. ALVARENGA subsequently arranged for a car to pick up Victim-3 and transport Victim-3 to ALVARENGA's office.

d. After Victim-3 arrived at the Hillside Address, ALVARENGA directed Victim-3 into a conference room, left Victim-3 alone for several hours, and then provided Victim-3 with numerous blank documents to sign. ALVARENGA represented that these documents would assist HASNY in re-financing Victim-3's mortgage. ALVARENGA also stated that Victim-3 would not be assessed any fee unless the re-financing was completed, and provided Victim-3 with a check in the sum of $5,000.

e. Victim-3 initially refused to sign the documents. ALVARENGA stated again in substance that he was interested in helping Victim-3 and asked her to sign documents that he said would assist Victim-3 in re-financing her mortgage. ALVARENGA further stated in substance that return transportation was provided only for customers and that Victim-3 would need to arrange for her own transportation back home if Victim-3 was not willing to sign the documents provided to her.

f. Victim-3 remained in the conference room at the Hillside Address while attempting to call her husband. After several more hours of waiting, Victim-3 signed the documents provided to her, believing, in part based on representations made to her by ALVARENGA, that she was facilitating a loan modification. Many of the blank documents contained the header, "Homeowner Assistance Services of New York." Included among the documents, however, was a contract of

8

sale of Victim-3's home to Launch Development for approximately $128,000. Victim-3 did not understand that by signing the documents given to her by ALVARENGA, she was agreeing to the sale of her home.

    g. At approximately 11:00 p.m., and only after Victim-3 had signed all of the documents that ALVARENGA had given her, Victim-3 was driven back to her home.

    h. The contract of sale signed by Victim-3 lists RAJESH MADDIWAR, the defendant, as Victim-3's attorney. However, Victim-3 never met MADDIWAR. The contract of sale also lists the address for Launch Development as the Horatio Address.

    i. In or about July 2014, Victim-3 received a notice from Launch Development directing her to vacate her residence.

  13. Based upon my conversations with a fourth individual ("Victim-4") and my review of documents provided by Victim-4, I learned, among other things, the following:

    a. In or about December 2013, Victim-4 had fallen behind on mortgage payments associated with her residence, which was located in Brooklyn, New York. Victim-4 was facing foreclosure and contacted HASNY for assistance. Victim-4 spoke with someone purporting to be an employee of HASNY over the phone and arranged to visit the office.

    b. In or about January 2014, Victim-4 visited the HASNY office at the Hillside Address and met with MARIO ALVARENGA, the defendant. Victim-4 explained to ALVARENGA that she wanted to receive a loan modification. ALVARENGA asked for certain items of information from Victim-4 to begin the process of applying for a loan modification and scheduled an additional meeting.

    c. In or about February 2014, Victim-4 again met with ALVARENGA at the Hillside Address. At the meeting ALVARENGA provided Victim-4 with a "Short Sale/Modification Check List" but highlighted the "Modification Check List." On a separate page, ALVARENGA wrote the lowered monthly mortgage payments that Victim-4 could expect to make as a result of the loan modification, estimating that Victim-4 could soon pay only $1,772 per month on her mortgage.

d. In or about March 2014, AMIR MEIRI, the defendant, visited Victim-4's home with an appraiser. MEIRI explained that they were there to appraise the home and that Victim-4 should point out any damages or issues with the house that could help to lower the value, purportedly in order to lower Victim-4's loan payments.

e. On or about March 27, 2014, ALVARENGA called Victim-4 to schedule another meeting to complete what Victim-4 believed would be the loan modification transaction. ALVARENGA informed Victim-4 that an attorney would be provided for her.

f. When Victim-4 arrived at the Hillside Address a few days later, ALVARENGA introduced her to RAJESH MADDIWAR, the defendant, and informed Victim-4 that MADDIWAR would be her attorney. Victim-4 was presented with numerous documents to sign, many of which were blank. When Victim-4 asked MADDIWAR why the documents were blank, he responded, in sum and substance, that she would receive completed copies later and that the process was normal and typical for loan modifications. Victim-4 proceeded to sign the documents. At the time she signed these documents, Victim-4 believed, based in part on representations made to her by ALVARENGA, MADDIWAR, and MEIRI, that she was obtaining a loan modification that would lower her monthly payments to approximately $1,772 per month. In reality, the documents provided for a short sale of Victim-4's home to Launch Development for approximately $335,000.

g. Victim-4 had purchased her home in or about October 2006 for more than $700,000.

h. In or about June 2014, MEIRI and CC-1 came to Victim-4's home, informed Victim-4 that they now owned her home, and demanded that she move out. Around the same time, notices were placed on Victim-4's property, which was a multi-family property that included rental units, stating that "effective immediately all rental payments are to be made to Launch Development LLP as the new and lawful owner of this property." The notices included a business card for ALVARENGA, listing him as the "Business Development Manager" for Launch Development.

i. In or about August 2014, after Launch Development began eviction proceedings against Victim-4, Victim-4 moved out of her home.

10

14. Based upon my review of public real estate records, I know that the Horatio Address is a residential property leased by AMIR MEIRI, the defendant.

15. Based upon my own interviews of other victims, my conversations with other law enforcement agents and review of reports of interviews of other victims, and my review of publicly available real estate documents, I know that other victims, located in the Bronx, Brooklyn, and Queens, had similar experiences to those described in paragraphs 10 through 14. Specifically, other victims were told that HASNY would assist them in obtaining a loan modification or other mortgage relief to avoid foreclosure, and then later learned that they had in fact sold their homes to Launch Development and would be forced to move out.

16. Based upon my review of transaction documents and public real estate records, I know that Launch Development has purchased dozens of properties in the Bronx, Brooklyn, and Queens since in or about January 2013 and identifies its address in each transaction as either the Hillside Address or the Horatio Address. In each of the transactions, the signatory for Launch Development was either MARIO ALVARENGA, AMIR MEIRI, the defendants, or CC-1.

17. Based upon my review of bank records and incorporation records associated with Launch Development, I know that Launch Development is owned by AMIR MEIRI, the defendant, and CC-1.

18. Based upon my interview with an individual, who was previously employed by Launch Development ("Witness-1"), I learned, in part, the following:

    a. Beginning at least in or about January 2013, AMIR MEIRI, the defendant, instructed Launch Development employees to conduct searches on the website www.propertyshark.com in order to collect information about distressed properties in Brooklyn, Queens, and the Bronx.

    b. Employees sent mailings to the owners of those distressed properties that advertised loan modifications and foreclosure relief. These mailings were not sent under the name of Launch Development but were rather sent under HASNY letterhead.

    c. MEIRI also instructed teams of telemarketers

11

employed by Launch Development to contact owners of the
distressed properties, introduce themselves as employees of
HASNY, and invite them into the office for a meeting concerning
foreclosure avoidance.

        d. Witness-1 received telephone calls from
homeowners complaining that they had expected loan modifications
or other forms of relief that would allow them to remain in
their homes, but then later learned that they would be forced to
vacate their homes. Witness-1 communicated these complaints to
MEIRI among others, who avoided speaking with the homeowners and
instead instructed Witness-1 to advise the victims that Witness-1 was working on the case.

        e. Witness-1 observed a female employee of
Launch Development using a notary stamp on transaction documents
bearing the name of an individual who was not associated with
the company.

        f. Witness-1 observed that MEIRI filed Uniform
Commercial Code ("UCC") liens on the distressed properties that
he and CC-1 expressed interest in purchasing. On at least one
occasion in 2013, MEIRI traveled to Manhattan to attempt to
complete the necessary paperwork associated to file a UCC lien.

    19. Based upon my review of the Automated City
Register Information System ("ACRIS") database, I know that
Launch Development has filed approximately 219 UCC liens on
properties in the Bronx, Brooklyn, and Queens since
approximately in or about December 2012.

    20. From my training and experience, I know that when
a UCC lien is filed on a property, it indicates that the
property owner owes a debt to the lien holder and that the
property cannot be sold to anyone other than the lien holder
without discharging that debt.

    21. From my interviews with Witness-1 as well as
numerous victims, I know that AMIR MEIRI, the defendant,
fraudulently filed UCC liens on distressed properties even
though the property owners owed no debt to Launch Development.

    22. Based upon my interviews with victims, my review
of bank records, and my review of publicly available real estate
documents, I know that MARIO ALVARENGA, RAJESH MADDIWAR, and
AMIR MEIRI, the defendants, have generated millions of dollars
as a result of their fraudulent scheme.

12

WHEREFORE, I respectfully request that arrest warrants be issued for MARIO ALVARENGA, RAJESH MADDIWAR, and AMIR MEIRI, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

_____
ROBERT GOLDBACH
Special Agent
Federal Bureau of Investigation

Sworn to before me this
20 day of May, 2015

_____
HONORABLE KEVIN N. FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK